## SUCCESSION OF JAMES McGILL.

No community exists between husband and wife who resided and were married out of the State and who never came here to live. C. C. 2370, 2369.

The place of the domicil is the proper jurisdiction for the settlement of accounts between tutors and minors; and where a settlement has been made before a court of the domicil, it will not be disturbed because the expenses of maintenance and education are charged upon the property situated there, instead of being charged upon property situated elsewhere, especially where no fraud is shown to have been practised in thus charging the expenses.

The action of minors against their tutors is prescribed by four years from the majority of the minors. C. C. 356. Judgment creditors of the tutors may set up this prescription, even if the tutors themselves do not. C. C. 3429.

APPEAL from the District Court of Concordia, *Farrar*, J. *D. S. Stacey*, for opponent, contended: In January, 1838, *Penelope McGill* purchased at a probate sale of the property of the succession of *John Ducker*, a cotton plantation at the price of about $90,000, for which she executed her notes bearing ten per cent interest after maturity, and secured by special mortgage on the property purchased. Subsequently, and before the full payment of the price by the purchaser, her son and agent, *James McGill*, commenced a suit to evict her from a portion of this land, containing about 450 acres. He claimed title under a sale made to him in 1842, by *H. F. Washington*, the vendor of *J. B. Warren*, who sold to *Ducker* in 1834. The grounds upon which he asserted his right to recover, and the defences against them, are fully shown by the record of the above suit, now on file in the Supreme Court, and which, by agreement, is to be used on the trial of this case; and by the decision of the suit by the Supreme Court rendered in April, 1849, the judgment was final in favor of the title derived from *Ducker's* succession, the court deciding that "the interest of the son and mother was the same, and the purchase of *Washington's* title, if the object was not a fraud on his mother, was to defeat the claim of *Ducker's* succession for the purchase money of the land, by establishing a legal ground for withholding payment in an eviction under an outstanding title. *McGill* v. *McGill*, 4th Ann. 263.

Upon the notes and mortgage given by *Mrs. McGill*, the curator of *Ducker's* succession instituted suit against her to recover the balance due. To this action she plead the danger of eviction, resulting from the suit pending against her in which her son *James* was plaintiff; after the decision of the petitory action, the Supreme Court in April, 1849, rendered a judgment against her for some $75,000. Upon this judgment execution issued, and under it the mortgaged property has been sold, and the price credited upon it, leaving a balance on it still due, as is admitted for the purpose of this suit, of at least $45,000. It is also admitted, that the curator has an interest in opposing in this suit the claims of the heirs of *Penelope McGill*, against her as tutrix, and the account rendered by her to them, and that if their demands and pretensions are allowed she will be rendered bankrupt, and nothing left wherewith to pay her debt to the estate of *Ducker*.

The record and the agreements of counsel show the following facts: *James McGill* and his wife *Penelope* were married in the State of Mississippi, of which State they were both residents at, and previous to their marriage, and that they continued to reside in that State until the death of *McGill*, which happened in March, 1832. That the inventory shows all the property *McGill* owned at his death in Louisiana, except the land, of which he owned 2865 acres, constituting his plantation on the island in Lake Bruin; that all the property owned by him in Louisiana, was acquired (by onerous title) by him during his marriage with the said *Penelope*, and that the said *Penelope* was appointed and qualified tutrix of her minor children on the 3d February, 1834. On the 28th September, 1849, the said tutrix presented her final account to her children, without any demand made by them, showing a balance against herself in their

Succession of favor of from $150,000 to $200,000. This balance is obtained by her by calcu-
McGill. lating the net revenues of the whole of the property owned by *McGill* at his death, and of that since acquired in whose names soever. The judgment of the court reduced the balance against her to some $84,000, and gave the heirs severally a minor's mortgage on the property of the tutrix for the amounts found to have been received by her before their majority.

The first point made by the curator in his opposition to the account is, that all the property owned at his death in Louisiana, by *McGill*, and which was acquired during his marriage, is community property; that the tutrix is the owner of the one undivided half of it, and entitled since the death of her husband to one-half of its revenues. The court, in its judgment, decided that no such community existed. The rights of the creditors and heirs of *John Ducker* rendered a decision on this question necessary; if the decision be that such community did exist, and that the property acquired, as the facts of the case shows, were acquets, then the debt due by *Mrs. McGill* can be realized; if otherwise, its collection will be at least doubtful, perhaps desperate. The amount involved in this suit is large; but it is only a drop in the bucket, a grain of sand upon the sea shore, when compared with the vast importance of the principles, now for the first time to be judicially and authoritatively established by the judgment of this court in relation to the rights of foreign wives upon property in this State. It may be safely assumed that there is in this State immovable property of the value of millions, acquired under circumstances and held by titles precisely similar to those under which the plantation and slaves in controversy were acquired, and are held. We wish then to inquire into the character of this property; we wish to know whether the laws by which we are governed, recognize an odious distinction between the right and left banks of the Mississippi; we wish to learn whether, under a marriage celebrated on one of its borders, they make the wife not only a sharer in the joys and the sorrows of her husband, but a partner in his prosperity and adversity; a partner in his good and ill fortune; a partner in the property they may acquire during the marriage; and if celebrated on the other shore, a miserable dependant—a being without rights and without hope, either present or future, of any reward for or interest in that which has been acquired by her joint labor and toil? We trust not, and believe that we shall be able to satisfy the court that such is not the law.

But it is whispered, the principle for which you contend has been decided against you. We deny this. It is admitted that in the succession of *Packwood*, it was assumed by the court that property acquired by the husband while the spouse resided out of the State, and where the marriage was celebrated out of the State, did not belong to the community, but to the person acquiring it. 9 R. R., 359. 12 R. R., 439. This seems to have been one of the legal axioms laid down by the court, and tacitly yielded by the counsel; I am not aware of any other case in which this position has been assumed or the doctrine asserted by the court. One isolated decision upon a doubtful point, does not constitute an authority binding either upon parties litigant or upon the court; but courts have frequently decided that they would consider such questions open to discussion and reëxamination, until they should become settled by a series of decisions.

With these preliminary observations we proceed to show that under the laws regulating and governing the rights of *McGill* and wife to property acquired by them or either of them in Louisiana, during their marriage, a community of acquets did exist between them, and that at the dissolution of the marriage, all property acquired by them or either of them in this State, during their marriage, belonged to that community. It is first proper to ascertain by what system or code of laws those rights are to be determined.

By reference to the statements of *Mrs. McGill*, it is perceived that her oldest child, *Jeremiah*, was born in 1816. This fixes their marriage at a date anterior to that time, and while the Old Civil Code and the laws of Spain formed the jurisprudence of this State. It has been decided that the rights of the husband and wife grow out of the marriage contract, and do not originate in its dissolution, and that the laws in force at the time the marriage was contracted, govern the rights of the spouses to the property acquired during its continuance, and not those in force at its dissolution. *Dixon* v. *Dixon's Executors*, 4 L. R. 191. If it be true, as contended, which we shall show not to be the fact, that the Louisiana Code contains legislation adverse to the existence of the community, or if the former laws have been since repealed, neither can have any bearing or effect upon the present case.

Judge Story, in commenting on the decision in the case of *Saul* v. *His Credi-* tors, says: "The result of this reasoning (and it certainly has great force) would seem to be that in the case of a marriage without any express contract, the *lex loci contractus*, (assuming that it furnishes the just basis of a tacit contract) will govern as to all movable and immovable property within the country; and as to property in other countries, it will govern movables but not immovables; the former having no *situs*, and the latter being governed by the *lex rei sitae*." Story, Conflict of Laws, No. 158. Further, No. 159: "Where there is no special contract, and there has been no change of domicil, the law of the place of celebration should govern the rights of the parties in respect to all personal estate (movables) wherever acquired, and wherever it may be situate; but real estate (immovables) should be left to be adjudged by the *lex rei sitae*, as not within the reach of any extra-territorial law." In No. 186, the judge lays it down as an axiom, the *lex rei sitae* will govern as to the immovable property; and No. 187, where there is no change of domicil, the same rule will apply to future as to present acquisitions. But where there is a change of domicil, the law of the actual domicil, and not of the matrimonial domicil will govern as to all future acquisitions of movable property; as to all immovable property, the *lex rei sitae*. In No. 483, he says, that "the descent and heirship of real estate is exclusively governed by the law of the country within which it is actually situate," and this is generally agreed to by foreign jurists.

In the case of *Saul* v. *His Creditors*, the court decided that the law of *Fuero Real*, which provided that every thing which the husband and wife might acquire while together, should be equally divided between them, was a real statute, that it constituted a part of the jurisprudence of the State, and controlled the personal statute of the domicil of the parties. 5 N. S. 578, 606. The same doctrine is affirmed in *Cole's Wife* v. *His Heirs*, 7 N. S. 47. The court there say: "It is true in that case *(Saul* v. *His Creditors)* husband and wife had both resided in this State; and in the present instance, the husband alone lived in Louisiana. But we then determined that the law, or, to adopt the language of the jurisprudence of the Continent of Europe, the statute, which regulated the rights of husband and wife, was real, not personal; that it regulated things and subjected them to the laws of the country within which they were found. It follows then, as a consequence, that property within the limits of this State must, on the dissolution of the marriage, be distributed according to the laws of Louisiana, no matter where the parties reside," &c., p. 44. The court also decide that this statute was not repealed by article 2370 of the Civil Code, that the former laws of the country were only repealed so far as to cover cases for which the code had made special provision. That the case of one of the married couple moving into the State was not specially provided for by the code, and that the former law in relation to it was not repealed by the general provision. That the article in the Old Code giving a community of acquets and gains in marriages contracted within this State, did not repeal a former law which gave them in marriages contracted out of the State, when the parties afterwards removed into Louisiana. That it was not necessary the statute should refer to the residence of the parties; as being real, all property acquired in the State and found there on the dissolution of the marriage, could be governed by its provisions, no matter where the parties reside. In the case of *Dixon* v. *Dixon's Executors*, 4 L. R. 190, the court again reiterate and re-affirm their former decisions, although the law of the *Fuero Real* had been repealed. They decide that the article 2370 of the Civil Code provides only for the case when both parties come into the State, and leaves the rights growing out of the removal of one of them here in silence. That the right of the wife in the community grows out of the marriage, is protected by the laws in force at the time the marriage was entered into, and that no subsequent legislation could rightfully take them away; accordingly they decided in the three foregoing cases, that a community did exist, and that the wife was entitled to one-half the acquets. See also 11 M. R. 27.

The Old Code established a community of acquets only in case the marriage was contracted within the territory, (p. 336, art. 63,) it legislated upon none other. Did the court refuse to decide upon the rights of wives married out of the territory? It did not; but declared that they were protected by the laws of Spain, which constituted a part of the jurisprudence of the territory. The Code of 1825 established it in the above case, and went one step further, and declared a community to exist between persons married out of the State, and afterwards removing in it as to all property acquired after their removal. C. C. arts. 2369, 2370. It legislated upon no other case; neither upon that where

SUCCESSION OF
McGILL.

only one of the spouses after marriage should remove into the State, nor on the case where neither should remove into it. Yet the court has passed upon both these cases, and decided them in favor of the wife; they have said, 5 N. S. 571, that the question as to the existence of a community of acquets "is one which grows out of the conflict of laws of different States." In the case from 5 N. S. the property was acquired in the State before the New Code was enacted; there was no provision in the Old Code establishing a community as to that property, and it was contended that as the code had provided only that it should exist where the marriage was contracted within the territory, it was an evidence the Legislature did not intend there should be a community where the marriages were made out of it. *Inclusio unius est exclusio alterius.* The court reject this conclusion, and assign their reasons in an elaborate argument: (5 N. S. 574, 575;) "they say that our codes were only intended to lay down general principles, and provide for cases of the most common occurrence." That it is more than probable the thoughts of the Legislature were not turned to a case of not frequent occurrence; that had the Legislature intended to have repealed the former law, they would have said so, and not left it to be inferred. This we consider to be sound reasoning. Legislation is intended for matters of common occurrence, and of general interest, and is not expected to cover isolated and particular cases: those may well be left to the sound discretion of courts, to be determined by the principles of equity, of natural law, and of general jurisprudence. We recongnize no titles to real property situate in this State, no matter where acquired, except those obtained in accordance with our laws; as to this species of property, we allow no extra-territorial effect to the laws of foreign States. Suppose that by the laws of Mississippi it was provided that on the dissolution of the marriage, all the property acquired in Louisiana during its continuance should belong to the wife or her heirs, would not our courts decide that it could have no effect upon real property situate in Louisiana? That it was strictly intra-territorial? Would they not distribute it agreeably to the provisions of our own laws? Most assuredly. Now the laws of Mississippi recognize no community between husband and wife. By those laws it is prohibited, because they contain a provision inconsistent with it, to wit, that the widow is entitled during her life to a dower interest in one-third of the real property left by the husband. Shall we give effect to the prohibition against the wife, when we do not recognize the provisions of the foreign law in her favor? Shall we give an extra-territorial effect to one law, and disallow it to the other? We refuse the wife her dower interest, because although allowed by the laws of her matrimonial domicil, it is prohibited by our own, by the *lex rei sitae.* Shall we debar her the benefit of a community, because the personal statute of her matrimonial domicil is opposed to the real statute of the *lex rei sitae?* Or in the absence of any legislation of our own, shall the personal statute have any force in the distribution of real property situate within our borders? If such be the case, then is the foreign wife a wretched being indeed; protected in rights and property by no laws; degraded from the rank of an equal with her husband; and upon his death, though he possessed millions, liable to be reduced to comparative want. If such be the case, it were perhaps well to introduce the Hindoo custom at once, and permit the widowed wretch, on the death of her husband, to ascend the funeral pyre and relieve herself from future sufferings.

As an illustration of the above: by the laws of Mississippi, slaves are personal property, and the husband by marriage becomes *ipso facto* the legal owner of all the personal property of his wife, and has the exclusive control and disposition of it; she may be worth hundreds of thousands of dollars, consisting entirely of personal property, slaves, money and choses in action. The husband immediately reduces the whole to possession, invests it in sugar or cotton plantations in Louisiana, and dies leaving no issue of his marriage. This property descends to his relations, if there be in Mississippi property sufficient to afford his widow barely a present support, to which she would be entitled under the laws of that State, she would in vain apply for relief to the courts of our own. If, on the contrary, she has been so fortunate as to be left a beggar there, she might, perhaps, unsuccessfully claim one-fourth of the property here, which one week before had been purchased and paid for with her own money! Can it be supposed that the Legislature who enacted the Civil Code, intended to legislate on the rights of wives thus situated? And that had they so intended they would not have done it in plain and positive terms, and not have left so important a matter to inference merely? The court, in the cases cited, has decided in the negative; that previous to the present code, a community did exist by the exist-

ing laws between husband and wife, as to property acquired in this State after their marriage, no matter where they were married or resided, has been shown by the above authorities. This was known, or is presumed to have been known to the Legislature. They must have known, or are presumed to have known, that the laws securing these rights to married women, could only be repealed either directly, or by enacting other laws contrary to, or irreconcilable with those then in force. C. C. 22, 23. They have done neither; have not touched the subject at all, but have passed it over in silence; it therefore remains to be governed by the same rules as before. 5 M. R. 94. 2 N. S. 30. 3 N. S. 199. 10 M. R. 172. *Bank of Louisiana* v. *Farrar*, 1st Ann. 54. The presumed intention of the Legislature, neither establishes the existence or the repeal of a law, when neither are shown, and that the laws previously in force have been neither positively or negatively repealed, that they remain unchanged and unaffected by the new Civil Code. And we have shown sufficient reasons why the Legislature, if the subject entered their minds at all, intended that the previous laws should not be repealed, but remain in force, and that courts of justice should, as before, apply their provisions to the protection of the rights of foreign wives, and that even should they not be regarded as binding still as laws, still in the absence of positive legislation, that they should furnish courts with a rule of action, as the exponents of natural equity and enlightened reason. C. C. art. 2. It is hardly necessary to observe that the act of 1828, repealing the Spanish laws, could neither destroy or affect any right acquired under those laws.

We hope to have succeeded in satisfying the court, that a community of property did exist between *McGill* and his wife, as to the property acquired by them in Louisiana during their marriage. His wife becoming on his death the owner of one undivided half thereof, and entitled to one-half of the revenues accrued from it since.

We now proceed to examine the account filed by the mother, or rather by her son *James* for her. The general charge in the opposition is, that the account is fraudulent, illegal, false and unjust, concocted by and between the said *Penelope* and her son *James*, for the purpose of rendering her insolvent, &c. As we are disposed to do injustice to no person, we willingly retract the above expression, so far only as the mother has been (nominally) a party to the business. We release her from any agency both in the administration of the property and the rendition of the account, and will institute in her place *Dougal McCall*, her brother-in-law—her son *James* still retaining his position. That these grave charges are fully supported will appear by the account filed; by the testimony on the record, even of the brother-in-law, witness *McCall*, and by the admissions of the counsel for the widow and heirs. In this: 1st. That she was credited with no rent of the Cammack tract of land, purchased by her in 1835, a portion of which has been ever since cultivated by the estate, nor credited herself with any rent for the Ducker place, nor claimed any allowance or deduction for the cotton raised on it, although cultivated by the estate since 1837. 2d. In studiously concealing the titles to the property acquired since the death of said *James McGill*, and evading the orders of court requiring a discovery of them. 3d. In concealing the death of three of her children, which occurred since the death of their father, and whose heir she was for the one-fourth part of their inheritance, claiming nothing for herself as heir, but surrendering the whole to the brothers and sisters of the deceased. 4th. In making no charge against her children for their maintenance, support and education. 5th. In remitting all the commissions for her administration to her children. 6th. In charging herself with the proceeds of cotton to the amount of between -$20,000 and $30,000, which, by the admission of her counsel and of the heirs, was accounted for by her in Mississippi.

This is the second suit in which, in the language of the court in *McGill* v. *McGill*, 4th Ann. 264, "the interests of the son (children) and mother are one and the same; and any other inference would be in conflict with the ordinary motives that influence human conduct." That their joint and sole object is to defeat the collection of a just debt, by establishing the bankruptcy of the mother, is too apparent to admit of a doubt, and it is presumed will not be denied by their counsel. In the former suit the effort was founded in the attempt to evict her from a portion of the land purchased. The widow and heirs will therefore be considered and treated as one and the same party, holding and asserting one and the same interest, in opposition to that of the curator of *Ducker*. When two parties, whom the law places in positions naturally and legally antagonistic, combine and act in concert with each other, where they alone have a knowledge of

SUCCESSION OF all the facts involved in the controversy; when they alone have the possession
McGILL. and control of all the evidence upon which that controversy is to be decided;
when they have it in their power to produce or withhold such portions of that
testimony as may suit their purposes; when by the intervention of irresponsible
agents, they are able to elude the mandates of the court calling for the produc-
tion of testimony within their power; when the transactions to be inquired into
are extensive, mere matters *in pais*, spreading over a long tract of time; and
when the parties possessing all these advantages are mutually interested, and
that interest swells to a vast amount, to suppress the facts as far as within their
power; to discolor and distort those that must appear; and to deny those in sup-
port of which they know no legal proof can be adduced, it will be easily per-
ceived how difficult it is for an opponent laboring under such disadvantages, to
develope his case and present the facts fairly and fully before the court. We
now proceed to take up the account and the opposition to it.

Objection 4th is, that since the death of the father three of his children have
died without descendants. This is admitted by the mother. One died in 1834,
one in 1838, and the last in 1840. On the death of each of those children, the
mother was the legal heir for the one fourth of his property. C. C. 907. The
widow became, successively, heir to one twenty-eighth, one twenty-fourth, and
one twentieth of the succession of her husband, through the succession of the
deceased children, amounting in the aggregate to one-hundred-and-seven eight-
hundred-and-forty-fifths, or more than one eighth of it, and entitled in her own
right to that proportion of the revenues; and should any balance be found in
favor of the children, as the net revenues of their father's estate, whether said
estate be the whole or only the half of the property left by him at his death, or
since acquired. The above proportion, one eighth, is to be deducted from it, or
credited to *Mrs. McGill.*

Objection 7th is, that the tutrix has not charged her children with any commis-
sions for her administration. These she was clearly entitled to charge, (C. C.
342,) and cannot renounce to the injury of her creditors. C. C. 1984. From
the revenues of the minors of each year, if there were any, ten per cent is to
be deducted, because the tutrix was authorized to retain in her hands that
amount. The heirs say, that they were entitled to interest on the amount of
moneys over $500 in the hands of the tutrix, which was not invested by her.
A sufficient answer to this objection is, that they have not claimed it; have not
opposed her acccount, but have specially accepted it. If they had the right to
charge their mother interest, it is sufficient for us that they have not done it.
We have the right to demand, and have demanded, that she shall charge com-
missions.

The 5th objection is, that the tutrix has made no charge against her children,
for their support, maintenance and education. Her account shows no such charge.
We find in a document purporting to be her administration account in Mississippi,
restated by her in May, 1850, long after her account was rendered in Louisiana,
an item, No. 424, of $5058 for the board of all the heirs. There were seven
children. They lived with and were supported by their mother, the cost of that
support being of course chargeable to them. One died at the age of two and
a half years, and two at the age of twenty-two years. Of the four children
living at the rendition of that account, one was about thirty years old, one about
twenty-seven, one about twenty-five, and the youngest about twenty-three.
We will omit the youngest, *Zebulon.* There remains six, two of whom died at
the age of twenty-two; of those surviving, the youngest was twenty-three, the
oldest thirty years. The amount allowed her by them for supporting, maintain-
ing and educating them, from the time of their father's death to the ages of
twenty-two and thirty, respectively, is just $843 for each one. I apprehend that
both the court and the counsel, most of whom are, I believe, fathers of families,
although perhaps not as wealthy as the testimony shows *McGill* to have been,
would gladly pay a much higher figure for the support and education of their
children to the mature ages of twenty-two and thirty. Upon this point let *Dr.
Duncan,* a very competent witness, who testifies from actual knowledge, as
father and guardian, speak. He says, that when children are educated at home,
the average yearly expenses of a child from birth to majority, would not exceed
$350; if abroad, it would not be less than $500. Of the two children *B. J.*
and *Jeremiah,* who died, one was, at the death of his father, about fifteen, and
the other sixteen years of age. From that period to the time of their deaths,
was six years for the one, and eight for the other. From those ages to the time
of their deaths surely $500 per year for the expenses of each would be a

reasonable charge; making $3000 for one, and $4000 for the other. From 1832 to 1849, when the account was rendered, we have seventeen years for *James McGill*, who was twelve years old at the death of his father. We may fairly average the expenses of his support and education during that period at $500 per year, making for him $8500. For *Susan McGill*, seventeen years, $8500. The same time for *John* and *Olivia*, and they being younger at their father's death, averaging their expenses severally at $450 per year, we have for them both $15,300, making the aggregate expenses of supporting and educating the six children from the date of their father's death to the time of their own deaths, or the rendition of the account by their mother, $39,300; making a difference in this one item of charge alone of over $34,000. Considering their ages at their father's death, their social position in life, and the affluent circumstances in which they were left, the above charges, under the testimony of *Dr. Duncan*, which is entitled to every consideration, would be reasonable. C. C. 343. The within amounts should be deducted severally from that of the net revenues of each of the heirs.

Again, the expenses for the support and education of the children should have been charged against their estate in Louisiana, and not that in Mississippi. The mother was confirmed as their natural tutrix by a court of Louisiana. She administered their property in that State in that capacity, if at all. She never represented either of them or the estate of the father in that State in any other capacity. The relation which was created and subsisted between them was that of tutrix and ward. In Mississippi she was appointed joint administratrix of the estate there, with *Dugal McCall*. She was in no manner the representative of the heirs, but of the creditors. Indeed, by the accounts of the administration in that State, she seems to have taken no part in it till the year 1842, but *McCall* acted in his own name as sole administrator till that time. The tutor alone administers the property of the minor, and represents him in all civil acts. C. C. 327. It is with him alone that the expenses of the minor are to be settled, (art. 343, 344, 345, 348, 350,) the ordering and regulating them constitute a necessary part of his duties, fall under his administration, are to be settled with him and by the court that appointed him tutor: no other court has jurisdiction.

The design of the parties in relieving the minors in Louisiana from the charges for their support and education, is sufficiently obvious. It is for the purpose of swelling any judgment they should obtain against their mother to an amount sufficient to protect whatever property she might be decreed to own in that State. They suppose that the judgment they have fixed up against her in Missossppi will protect all her property in that State from the claims of her creditors. As alleged, their object is to render her bankrupt in both States; and it is admitted, that if the present attempt is sustained, nothing will be left for the curator of *Ducker's* estate. This the law does not permit them to do. If the charge is required by law to be made against them in Louisiana in favor of the tutrix, they cannot transfer it and place it upon the property in another State to the injury of a creditor. C. C. 1984, 1985. *Hayden* v. *McNutt*, 4th Ann. 69 to 71.

By reference to the inventory of the personal property of *James McGill's* estate in Mississippi, it appears that there were eighty-six slaves, and movables, which were together valued at $37,161 25; money and notes, $27,284 08.

Under the laws of Mississippi the widow's dower is a child's share in fee simple—one eighth of the personal property: of the money and notes, say $3410, and about eleven of the slaves; and of the real property, (which consisted of cotton plantations,) she was entitled to one third part, during her life. The value of this property is shown by the deposition of *McCall*, to have been about $60,000. This is obtained by deducting the value of the personal property, as shown by the inventory, from the value of the whole property of *McGill* in Mississippi, as shown by the same witness. The widow was, then, entitled to receive the same proportion of the revenues of this property as she had an interest in the property itself. Her interest in the whole of the personal property was $8057; and in the real property, a usufructuary interest of $20,000: making together $28,057. The interest of the heirs in the personal property was $56,399; and in the real property it was $40,000: making $96,399; giving to her about seven twenty-two parts of the whole revenue of the property, and the same interest in any property that might be purchased with the revenues of that property, and also the same proportion of the revenues of the property thus purchased.

Now, not one dime has been allowed the widow, either in the accounts rendered in Mississippi or Louisiana, for the revenues of her interest in this property; although *McCall*, the agent, swears, that with the revenues of the Mississippi property, he has purchased eighty-two slaves, the price of which is charged against the estate in Mississippi; which slaves have been partially employed on *McGill's* estate in Louisiana, and in the Louisiana account the whole product of their labor is charged against her as the tutrix. Now, the property in Louisiana, as shown by the inventory, did not exceed $25,000. Of this the widow was entitled, as has been shown, to more than one eighth part by inheritance from her deceased children; of the slaves removed from Mississippi, and worked upon the property, she was entitled to more than one fourth part, making perhaps her portion of the net revenues of the property, one-fifth part, perhaps more. Yet, not one dime has been allowed her in the account rendered, but the whole charged against her. *McCall*, the agent, swears, that he has paid *E. Sparrow*, curator, on account of *Mrs. McGill's* purchase of the Ducker estate $79,544 58, and that all this was paid out of the revenues of the Lake Bruin and Botany Bay plantations, in Louisiana, with the exception of $4000 derived from the Mississippi property; yet we find in his Mississippi account $12,000 charged to *Mrs. McGill*, as having been paid to *E. Sparrow*, and $400 also charged. (Record, p. 43, 45.) This same man, *Dougal McCall*, party, agent and witness. when called upon to furnish a list of the names and ages of the slaves he had purchased while administering the estate, and to state in whose name or names they had been purchased, was utterly unable to answer the question. In his answers, and in his reply to the order of court, calling upon him to produce the titles, he skulked and evaded the inquiries; but in the account rendered by him in Mississippi, for reasons well known to every one engaged or employed in this suit, his memory was sufficiently tenacious to answer all the purposes of that settlement; and accordingly we find in his account the names and the prices of the negroes he had purchased; but we are never informed in whose name said slaves were purchased, although we have endeavored to elicit that fact from the commencement of our inquiries. Neither the mother, the son *James*, nor the brother-in-law, the witness seemed to know anything about. Hence the shuffling, the evasions, and the tergiversations with which they have treated all the orders of court, calling for this information; as the court will easily perceive by an examination of the record.

It appears that land was purchased from a *Mr. Snodgrass*—the amount near $6000—and charged to the estate by the administrator *McCall*. Our courts can neither know nor recognise transactions of this kind, except under a state of facts which have always existed in this case, and which govern it. It is neither that of tutorship nor administration, as we shall hereafter prove to your honors. The field of observation has now so wide a margin, that our remarks, not to be too prolix, must almost necessarily be desultory. *McCall* says that the Cammack tract of land was purchased for the estate of *McGill*. I do not doubt the fact. But the court will perceive that the purchase was made in the name of and apparently for *Penelope McGill;* still, I do not doubt the fact; I only object to a groundless discrimination between this and other purchases made in the same manner. When the investments were considered good speculations they were claimed for the heirs; when they are not, they are thrown upon the shoulders of the mother, who is made the scape-goat, in order to avoid the payment of the price. But let us return to the accounts: *McCall* swears that he received from *Bondurant*, the first tutor and curator *ad bona*, $7700, which he invested in the Cammack tract of land. *Bondurant's* final account was homologated the 3d of February, 1834, and the balance then in his hands in favor of the estate was only $3711 64; his administration then ceased, and *Mrs. McGill* was appointed and qualified tutrix on the same day. This sum, then, was the actual amount realized by the heirs from his administration: The proceeds of the crop raised in 1834 was $7470 20; 1835, $12,885 67; 1836, $11,784 51; 1837, $12,938 74. The net proceeds of the crops for the years 1835, 1836, and 1837, being $37,608 92; this is charged in the account against the mother; but *McCall*, inadvertently telling the truth, swears that the crops of those three years were principally expended in improving the plantation, it being much out of repair. This small item of $37.608 92 is to be deducted from the amount with which she has charged herself in her account!

The Ducker plantation was purchased by *Mrs. McGill* in January, 1838. During the years 1838, 1839 and 1840 it was cultivated with the Lake Bruin plantation of the estate, and the cotton of both places sold together under the

same mark. The net proceeds of the cotton raised on the Ducker place, 1841 to 1848, both inclusive, was $27,733 60; making the same average for 1838, 1839 and 1840, $11,400 10; the whole would be $38,133 70.

Of the slaves, &c., with which this cotton was raised, *Mrs. McGill* was the owner of an undivided eighth; the plantation upon which it grew was owned by her alone, and cost her about $56,000; they would then divide between them the revenues in proportion to their joint ownership in the capital employed. This would entitle her to from two-thirds to three-fourths of the cotton raised on the Ducker place, and to half or more of that raised on the Cammack tract owned by her; but the entire revenues of both these places are charged against her. The heirs insist that they are only liable to pay rent for the land that has been cultivated. As well might the mother claim to pay them for the hire of their slaves and the rent of their land. The association which grew out of their joint ownership of the property, and their cultivating the property together, constituted an ordinary particular partnership; and all the revenues made are to be divided among them in proportion to their respective shares in the capital stock employed.

*Dougal McCall* has sworn to the correctness of the whole of the account as at first made out and filed by *Mrs. McGill*, charging herself with the proceeds of cotton to the amount of some $180,000. He knows all about it, where the cotton was raised, the marks, the sales, &c., and that it should be charged in the Louisiana account. At the time his evidence was thus given, he and *Mrs. McGill* had rendered their accounts in Mississippi, and of the cotton included in the Louisiana accounts near $23,000 had been included in the Mississippi account, and charged against *Mrs. McGill*. This is admitted in writing on the record by the counsel of the widow and heirs; since then, sixty bales more have been discovered and withdrawn from the Louisiana account; making the whole amount so withdrawn near $30,000. No account of sales of cotton accompany the Mississippi account; the dates of the sales and names of the purchasers are not often stated. How can we or the court know whether they are correctly set forth, or that this same identical cotton has not already been embraced in the Mississippi account? As to near $30,000, the fact stood unblushingly on the record, and was corrected by the counsel; as to the balance we have no means of knowing, as we cannot rely upon the correctness of the Mississippi accounts. As far as we know, the whole of the cotton included in the Louisiana account may be embraced in those rendered in Mississippi; it was incumbent upon the parties, the widows and heirs, or rather the party, for they are all one, to have proved by legal evidence every fact put at issue by the opponent, *Sparrow*. All these accounts and charges against the widow were specially denied, and proof demanded of each item; the account was voluntarily rendered by her, it was specially accepted by the heirs. It will appear not a little remarkable, that by reference to the depositions on file, the tutrix has taken upon herself the *onus* of proving against the curator, *Sparrow*, the correctness of the charges made in her accounts against herself in favor of her children! This is not strange; but it looks strange to one not fully understanding the whole subject. The secret is, they are all one and the same identical party.

In relation to the slaves and lands purchased in Mississippi, the titles to which we have made such strenuous efforts to obtain, but which, and the orders of the court have been successfully evaded; it is believed, and it is a fair presumption, that said purchases were made, and that the titles stand either in the name of the widow, or jointly in the name of the widow and heirs. This would seem to follow from their having been purchased with the proceeds of a common fund. By reference to the Mississippi accounts, it will be seen that the widow is charged by *McCall*, administrator, for building a house, $3000, and for money advanced for her separate use, and the interest on it, $24,760 31, and not a cent allowed her for her portion of the revenues of the estate. It will also appear that in 1842, just before *McCall* took the benefit of the bankrupt act, that he acknowledged to be indebted to her in the sum of $30,000, and that he transferred to her a plantation and slaves in payment.

Again, as regards her creditors, the record furnishes no sufficient evidence that she is indebted to her children in any amount; it furnishes a strong presumption to the contrary. As between her and her children the proof might suffice, but not as against third persons. What are the facts? why, that her son *James* has been of age nine years; *Susan*, six years; *John*, four years; and *Olivia*, two years, and the youngest is married. Notwithstanding this great lapse of time, it is not pretended that until 1849, any claim had ever been made

SUCCESSION OF of the mother by either of the children for a settlement of her accounts. Had
McGILL.    the demands they now make been *bonâ fide* and unsatisfied, it is somewhat
strange that a settlement and rendition of accounts had not been pressed, in
order to realize, as far as practicable, the alleged large balance in their favor.
Under such circumstances, we may fairly assume, that extra-judicial settlements
have been made, and all their accounts amicably adjusted and satisfied. These
matters rest on their knowledge alone. But the widow had made an injudicious
purchase of property to a large amount. It was not worth the price she had
agreed to give for it, and she thereby became somewhat embarrassed. She
must be saved from the consequences of this purchase. And how was this to
be affected? Why, by her children, or one of them, purchasing a supposed
outstanding title, attempting to evict their mother from a portion of the property,
and thereby relieve her from the payment of some $40,000 of the price. This,
although managed with singular tact and shrewdness, signally failed of success.
The next step to attain the same end was to cover her with the protecting
shield of minors' rights. This was evidently an after thought, not unadvisedly
got up, to meet the exigencies of the case. The court will decide whether it is
to answer the purposes designed.

It appears that *James McGill* arrived at the age majority the 31st of August,
1841; *Susan*, the 23d of June, 1844; *John*, the 2d of May, 1846; and *Olivia*,
the 3d July, 1848. The crops of the years 1840, 1843, 1845 and 1847 would
have been gathered and been received during the respective periods of their
minority; and it is only for the amount of the mother's indebtedness to them at
the respective periods of their majority that they are entitled, if at all, to a
mortgage against their tutrix; after that time, she was merely their *negotiorum
gestor.*

Against the claim of *James* and *Susan*, the oldest children, the opponent has
pleaded the prescription of four years, under the 356 article of the Civil Code,
by which the action of the minor against the tutor, respecting the acts of his
tutorship, is prescribed. Although this plea may be, and has been waived by
the parties *inter se*, it cannot be waived to the prejudice of creditors, who have
the right to use it themselves. C. C., art. 3429. *Durnford* v. *Clarke*, 3 L. R.
201. This disposes of the claims of two of the children, growing out of the
tutorship of their mother. Whatever liability she may have incurred towards
any of her children, since they arrived at the age of majority, has not been
incurred in her capacity of tutrix, and she is not liable to account to them as
tutrix. It is not deemed necessary to make any remarks upon the objection
taken, that the plea of prescription comes too late, as if a plea of prescription could
not be filed at any stage of the suit, even in the Supreme Court, but become
prescribed itself. But the true view of the case, although casually hinted at,
has not yet been given; it is not and never has been one either of tutorship or
of administration, and the rules of law applicable to the settlement of such cases
can have no bearing on this. The true functions of courts of justice are to arrive
at truth, and to disregard the forms in which matters may be clothed which are
brought before them for investigation, or to regard them only so far as they may
assist in arriving at a correct conclusion.

A judgment rendered by consent of parties, or by collusion between them, without
actual litigation, is not in the true sense of the term a judgment, or to have
effect as such, but only as an agreement of the parties, binding perhaps upon
them, but upon no one else. A sale, although conducted with legal formalities
and clothed with judicial forms, yet if made only to consummate a private
arrangement, possesses none of the essential attributes of a forced judicial sale.
These principles have been so often recognized and consecrated by the courts of
our own State, and especially by courts of equity of all countries, that it is
unnecessary to refer to special authorities in support of them. An administrator
of a large estate, not involved, receiving large revenues from it, invests them by
private act in the purchase of land and slaves for and in the name of the widow
and heirs, he builds houses, and makes expensive improvements on the property,
purchases bank stock, receives the dividends, deals with the funds of the estate
as if they were his own, and at the close of his administration the widow and
heirs ratify all his acts, acknowledge themselves to be joint proprietors of the
property thus acquired by him, and divide it between each other. This is all
shown by the administration of *McCall* in Mississippi, as exhibited in the
account there rendered and the record from the probate court.

A woman is confirmed in the tutorship of her children. She never takes possession
of their property. She never personally administers it. None of the

revenues go into her hands, except such as she may need for her personal use. The property and the administration of it is delivered over to her brother-in-law, the uncle of the children, as her agent. He administers it, receives the revenues, with them purchases property in the name of the tutrix, some of which the heirs claim, (the Cammack tract,) and other purchases they repudiate. One of these children, after arriving at the age of majority, *(James McGill)* acts for eight years as the agent of his mother, with the uncle and brother-in-law. Out of the revenues of the estate they make heavy payments upon property purchased by them in her name. They expend some $30,000 in three years, in improving a plantation of the estate. They take possession of all the property purchased in the name of the tutrix; they blend and intermingle with it the property of the estate; cultivate it together; they claim and receive the revenues of the whole. Long after the majority of the youngest of the children they make payments on the property purchased in her name. The heirs permit from eight years downward to two, after their majority, to elapse without ever demanding from their tutrix a settlement. They do it at last only to protect her from the consequences of an unfortunate speculation made by them, but in her name.

In conclusion, we recapitulate: 1st. That all the property owned by *James McGill* in Louisiana at his death was community property; and that one-half of it and of its subsequent increase and revenues belong to his widow, *Penelope McGill*. 2d. That as heir, inheriting one-fourth part of the succession of her three children, she is the owner of the one-eighth part of the succession of their father, and entitled to the revenues of the portions so inherited since the dates of their deaths respectively. 3d. That ten per cent commissions should be charged the heirs and allowed the tutrix, on the amount of their annual revenues. 4th. That the tutrix is bound to charge the heirs, and to credit herself in her account rendered in this State, with the support and education of the children, say $39,000, or so much as has been proven. 5th. The court should allow the widow her dower interest in Mississippi, according to the laws of that State, in the real and personal property situate there, belonging to the succession of *McGill*, and its subsequent revenues, and in all the property subsequently acquired there, and the revenues of said property, no matter where realized or accrued. 6. Instead of allowing $7700, as having been received from *D. M. Bondurant*, tutor, as sworn to by *McCall*, only $3711 64, the balance shown by his final account, should be allowed. That $7510 66 should be deducted, the same having been lost in the hands of *James Armor*, and $37,608 92, the amount of the crops for the years 1835, 1836 and 1837. 7th. That $38,133 70 should be deducted, the same being the net proceeds of the cotton raised on the Ducker place after it was purchased; or that *Mrs. McGill* should be allowed the same proportion of this sum as she had capital invested in the land, and the value of her interest in the slaves, &c., that produced it, and that her *pro rata* proportion of the cotton raised on the Cammack tract of land should be allowed her. 8th. That in this suit no account should be taken, and no allowance made the minors, for any revenues accrued to them severally after they arrived at the age of majority. 9th. That the plea of prescription of four years should be sustained against the claims of *James* and *Susan McGill*. 10th. That a partnership should be decreed to exist and to have existed between the said *Penelope McGill* and her children since 1832, managed and administered by their agents, and that their liabilities towards each other and towards third persons are the same as those of ordinary partners.

*Benjamin* and *Micou*, for appellees, contended: *James McGill* died in 1832, leaving a wife and seven children. His residence and that of his family was in Mississippi, where his principal estate was situated, but at the time of his death he possessed a plantation and slaves in the parish of Concordia. *Mrs. McGill*, his widow, and *Dugal McCall*, were appointed joint administrators in Mississippi. No administrator or curator was named in Louisiana, but *D. M. Bondurant* was appointed tutor of the minor children and acted as such until February, 1834, when *Mrs. P. McGill*, the mother of the minors, was duly sworn and qualified as their natural tutrix, and succeeded *Bondurant* in the administration of their property. Three of the minors, heirs of *McGill*, died, and no account was ever rendered of the administration of the tutrix until the present, which was filed in September, 1849.

This account is a statement of the proceeds of all the crops made on the Louisiana property, and of the expenses and disbursements made or incurred

for it.  It did not pretend to settle the rights of *Mrs. McGill* as co-heir of her deceased children, or her commissions, but was simply a statement of receipts and disbursements; and it was filed with full knowledge that it would be opposed by the curator of *Ducker's* estate, who was a large creditor of *Mrs. McGill.*  As it was well understood that every possible objection would be urged by this creditor, the account was presented to enable him to present his objections, and to settle contradictorily with him the rights of the heirs.  The opposition was accordingly made, and abounds in charges of fraud, collusion and combination.  The argument presented in support of it reiterates these charges, and attempts to influence the mind of the court by references to another controversy between the same parties, which this court has decided against the present appellees.  As to the suit referred to, it is unnecessary to say more than that it has nothing whatever to do with the present; and we rely upon the good sense of the court not to permit its attention to be withdrawn by considerations extraneous to the case now before it.

The account was made up by stating, on one side, the proceeds of the crops, and on the other, the expenses incurred.  Both sides of the account were supported by vouchers;—the account-sales of the merchants, and the bills for disbursements;—but for convenience these vouchers have been omitted from the transcript.  The nominal balance against *Mrs. McGill,* after deducting the disbursements from the receipts, was over $150,000, but the parties expected the amount to be reduced and the true amount ascertained, on the opposition of the creditor.  This we conceive was fairly and properly done on the trial below.  Every well founded objection was admitted, and credit given accordingly.  The opponent declined arguing the cause below, and the court had only the opposition before it, yet the counsel for the heirs and for the appellant opposed no credit which seemed fair and reasonable.

The following allowances were thus made:  Before submitting the cause, the errors resulting from charging in the accounts items which had already been accounted for in Mississippi were corrected.  These reduced the account by about the sum of $22,000.  The appellant claims a further reduction for the proceeds of sixty bales of cotton for this account, but we believe he is not entitled to it.  *Mrs. McGill's* commissions of ten per cent on the revenues was allowed, although they had not been invested; and no claim was made against her for interest.  She was allowed rent for her lands which had been cultivated by the slaves and stock of the succession, and at its expense.  She was allowed her share in the successions of the three children who died after the father.

If the court finds a single item allowed by the judgment, which it believes to be either fraudulent or illegal, it must be stricken out; but if the amount allowed by the judgment be really due to the heirs, the judgment cannot be successfully assailed by broad and general charges of fraud.  We will give to these charges no further notice, but proceed to treat the case as a matter of account and of law.

And first, we will here repeat those objections in the brief, which are already answered and allowed by the judgment of the lower court.  The judgment allows to *Mrs. McGill:* 1st.  Ten per cent commissions upon the revenues of the minors.  2d.  Rent of her lands cultivated by slaves of the succession.  3d.  Credit for $7500 lost by the bankruptcy of a commission merchant.  4th.  Her distributive share of one-fourth in the successions of her three deceased children.  5th.  The account had already been corrected in the progress of the trial by the deduction of some $22,789, which, on comparison of the Mississippi and Louisiana accounts, were found to have been accounted for in the former.  These deductions reduced the sum due to the heirs to $84,000, for which the judgment was rendered.  The appellant has taken pains to repeat in his brief the objections on which these deductions were made, no doubt with the hope of creating a prejudice in the mind of the court against the entire claim of the heirs; but we are satisfied that this hope will not be fulfilled.  The reductions have been made; the appellants do not complain of them; and the question before the court is not whether the account was surcharged, but only whether the judgment upon it is correct.

We will therefore assume, as the basis of our investigation, that the judgment of the lower court must be presumed to be correct until shown to be otherwise by the appellant; and, laying out of the question those objections already met and satisfied by the judgment as it stands, will proceed to consider those which were not allowed below.  If these objections be met, the judgment must stand,

1. The first to be considered is the allegation that there was a community of acquets between *McGill* and wife, under which *Mrs. McGill* became owner of one-half the property left by him in this State, and entitled in her own right to half its proceeds.

It is fully admitted that *McGill* and wife were not married in Louisiana, and never resided there; but it is contended that the community laws of this State are real statutes, governing all the property within its limits, and consequently that if a married man residing abroad purchases property here, a community is created by our law between him and his wife as to the property so acquired. The Spanish law is principally relied on, the marriage having occurred before 1825, but it is also argued that art. 2370 of the Code has made no change in this respect. We will examine these positions, taking the Spanish law as it was declared by the judges of this State while in force here.

In the case of *Saul* v. *His Creditors*, 5 N. S., two texts of the Spanish law are quoted, one from the Partidas, translated as follows: "And we say that the agreement they had made before or at the time of their marriage ought to have its effect in the manner they may have stipulated, and that it will not be avoided by the custom of the place to which they may have removed. And so we say it would be if they had not entered into any agreement, for the custom of the country where they contracted the marriage ought to have its effect as it regards the dowry, the *arras* and the gains they may have made, and not that of the place to which they may have removed." The other text is from the Fuero Real: "Every thing which the husband and wife may acquire while together, shall be equally divided between them."

The error of the counsel consists in taking one text of the law to the exclusion of the other. He has not noticed the law of the Partidas at all, but relies entirely upon the construction given by the court to the law of the Fuero Real. But both texts were of equal force and dignity. They were laws on the same subject, and of the same character; consequently, if one was to be classed as a real statute, so was the other. There was nothing whatever to distinguish the character or class of one from that of the other. If all property in Louisiana was governed by the Fuero Real, so it was governed by the Partidas; and yet there is an apparent conflict between the two texts. Under one, the property was common, no matter where the owners were married or resided; under the other, it was not common if the parties were married in a country where the community of acquets did not exist.

The principal object of the decision in *Saul* v. *His Creditors*, was to reconcile this apparent conflict. It was held, that under the Partidas the law of the place of marriage governed only so long as the parties remained at that place; and that on their removal to a country under Spanish dominion, their acquisitions were governed by the Fuero Real. It is declared by the learned judge who pronounced the opinion that this article of the Partidas had received such a restricted interpretation by every Spanish writer from Gregorio Lopez, in 1555, down to Febrero, in 1781; and it is obvious that without such limit it would conflict with the law of the Fuero Real. It was accordingly decided, that *Saul* and wife having married in a country where no community was recognized, and having removed to Louisiana, and afterwards acquired property, that property became common. In other words, their acquisitions, while they remained in the country of their marriage, fell under the rule of the Partidas; and the acquisitions after removal, under the rule of the Fuero Real. This seems to be the natural result of the two texts, and the judge begins by stating that the general opinion of the bar and the bench had been, that the property acquired after removal became common.

The only question involved in that case seems thus easily solved, and readers of the present day cannot appreciate the necessity of the very elaborate disquisition which follows in the same opinion, upon the question of real and personal statutes. There are statutes strictly personal: for instance, criminal laws and laws regulating the domestic relations, but all laws in relation to property regulate the rights of persons in the property. No law was ever passed, nor can we conceive a human law which can regulate things without affecting persons, or the rights of persons. Consequently there can be no statute purely real. The division of statutes which regulate the rights of property into real and personal must therefore necessarily be arbitrary or fanciful. Where the Legislature is supposed to have more particularly in view the regulation of persons and their rights, resulting from their peculiar condition or relations, there the statute is

classed as personal; where the rule is applicable to all property without exception, the statute is called real. We do not know that any writer has made the distinction precisely in this manner, nor do we know that any two writers have laid down precisely the same rule. Every one is free to make the line of division for himself, and the attempt to decide which is the true line by authority of the learned, is illusory. The most industrious research can lead to no conclusion except that which the judge arrived at in this case. "Where he, therefore, (d'Aguesseau,) and so many other men of great talents and learning are thus found to fail in fixing certain principles, we are forced to conclude that they have failed, not from want of ability, but because the matter was not susceptible of being settled on certain principles." 5 N. S. 595.

Things which are indefinite in themselves cannot be defined; and it is therefore impossible to say, in the majority of cases, whether a statute affects persons more than property, or the reverse. As to a very few statutes, such as registry laws, most minds would agree in the opinion that the Legislature had in view principally the regulation of property; but in the mass of statutes there would be an equal division of intelligent opinions whether they should be classed as real or personal. The law regulating community is such a law; it regulates property and it applies only to a particular condition or class of owners. The most enlightened and learned have differed and will continue to differ on the question. We must therefore venture to express our surprise that the distinguished judge who pronounced the opinion of *Saul* v. *His Creditors*, after demonstrating the impossibility of making the distinction, should himself attempt to make it. After showing that the weight of authority on the two sides was equal, he concludes that in his opinion the statute in question was real. Yet it does constitute a general regulation of property. It is an exceptional regulation dependent upon the peculiar position of the owners, and may be as well said to be a regulation of marriage as one of property. That it is both every one will agree; to which it most applies no man can decide, even to his own satisfaction, much less to the satisfaction of others.

The subject was evidently a favorite one with the judge. Nearly all the treatises on the conflict of laws, then extant, were in foreign languages, and it was natural in one who had studied them carefully to give to the profession the benefit of his researches. But to make the rights of parties depend upon distinctions so purely fanciful and refined, can never be satisfactory. Nor indeed does it seem to have been necessary in that case. Whether the law was real or personal it was the law of the State. It plainly provided that the property acquired by married persons should be common; and where the married persons and the property were both under the dominion of the same law, what room was left for the application of any foreign law? The attempt to create an exception consequent upon the marriage having been celebrated in a foreign country, was answered at once by the uniform and concurrent interpretation given to the article of the Partidas.

In the case of *Saul* v. *His Creditors*, both the husband and wife had removed to Louisiana, but in the subsequent cases of *Cole* v. *Cole*, 7 N. S. and *Dixon* v. *Dixon*, 4 L. R., the husband alone had come to this State. Upon the well settled principle that a wife has no other domicil than that of her husband, it would seem that the residence of the husband here was equivalent to the residence of both parties, and this is, of itself, sufficient to decide the question. But the judge prefers to carry out the distinction he had so elaborately drawn in the first case, and declares that the community existed because the law was real.

But in all these cases, at least one of the parties resided in the State at the time the property was acquired. The counsel for the appellant is the first who has seriously presented an argument to the court in support of the proposition that property purchased, when both husband and wife reside out of the State, becomes common. He tells us that the title to millions are involved in the decision of the question, and we concur with him that it is so. But we must add, that so universal and uniform has been the opinion of the bench and the bar against a community existing in such cases, that these titles have hitherto reposed upon that opinion in complete security. A contrary decision would produce a most profound and disastrous effect. No principle could be affirmed by the courts so well calculated to destroy all security of titles and to create confusion and doubt.

· The counsel admits that the precise question was decided in *Packwood's* case, in 9 R. R. and 12 R. R.; but speaks lightly of the opinion, as a single opinion

inconsiderately given. But it is obvious that the question was directly presented <span style="float:right">Succession of<br>McGill.</span> to the court. The parties were married abroad; they came here to reside, and they again removed to another State. It was held that when they came here to reside, they came under the *regime* of the community as to all property afterwards acquired; that so long as they resided here this rule continued, but that the property acquired after their second removal was not common, because the law had ceased to apply to them. This the court states to be the legitimate deduction from the principles laid down in *Saul* v. *His Creditors,* and *Cole* v. *Cole;* and the opinion pronounced in the first case was repeated in the second.

We must therefore assume, that even under the Spanish law, the position assumed for the appellant could not be maintained. But since the Code of 1825, and the repeal of the Spanish law in 1828, it becomes almost preposterous to raise such a question. So long as the general provision of the Fuero Real remained unrepealed, argument might be listened to on the subject; but since the repeal of that law the position has no basis whatever. It might well be held while the general law was in force, that a statute declaring the community in one of the cases, already embraced in the general law, did not repeal its application to other cases. But now the general law is epealed, there is no statute in force creating this exceptional and peculiar title to property except the articles of the code. If the case be not within the scope of these articles, how can such a title exist?

But we think it apparent that the Spanish law was precisely the same with that now contained in our code. The Spanish legislators were not so affected with the spirit of their illustrious compatriot Don Quixote, as to attempt to regulate the relations of married persons all over the world. They were satisfied to provide for the families under their protection, and hence their law, like our own, required both the residence of the parties and the acquisition of property to make it common.

The general question, whether the property purchased in foreign countries is governed by the law of the place of the property or of the matrimonial domicil, is learnedly discussed and the conflicting opinion of authors collated in Story's Conflict, § 145 *et seq.*, and the only possible result of all the learning and research wasted on the subject, is that the mind is left as undecided as before. It is like the distinction between real and personal statutes, too fine to be capable of definition. But we are relieved from all this discussion by a very slight attention to the facts of this case. The law of Mississippi, the matrimonial domicil recognizes no community, consequently no such title can result from that law; while the law of this State provides for a community only when the parties reside here, and their residence being abroad, it has no application to their property. There can be no conflict to be reconciled between two laws in a case where both laws lead to the same result.

If, on the other hand, the appellant had succeeded in showing that the Spanish law would have created a community, he has failed to show that that law ever applied to the property now in dispute. It is certain that no community was created in Louisiana by the mere marriage in Mississippi, and before any property was acquired here. No community could exist before the property was acquired, and there is no proof that any property was acquired before the Spanish law had ceased to be the law of Louisiana.

Nor is this a question of inheritance, which, as to real estate, is always governed by the law of the *situs.* The husband is not sole owner of the community, nor does the wife receive from him as heir. She is the partner in its acquisition, and he has no more control over her share in his will, than he has over the property of strangers. So true is this, that where the husband devises half his estate to his wife, she receives the half of the common property in her own right, besides the half of his share under the will. *Theall* v. *Theall.*

It is not a question arising from a conflict of laws. We admit that the law of Louisiana alone regulates the whole subject, and the question is what is that law? We contend that it creates no community except in case of residence here. Our own law does not create such a title in the wife to acquisitions of the husband while both are absent, and the argument of the appellant has no basis whatever.

We do not follow the counsel into his discussion of the natural justice or equity of the position which he assumes. It is true that the wife has neither dower nor inheritance in the lands of the husband acquired here, and she may in some cases be left destitute of support, while heirs enjoy the wealth of her

husband.   But all such considerations should be presented to the Legislature, which has the power to alter the law, and not to the court.   The court cannot make new rules upon every new case of supposed or fancied hardship.   It can only administer the law as it is written.

2.  We next consider the objection that the mother has made no charge for the maintenance and support of the minors.   As the domicil of the family was in Mississippi, and the principal property there, it seems both legal and natural that their support should be drawn from that property.   The calculation in the brief as to the supposed amount of this expense, is entirely fanciful.   The expense of a family living on a plantation is inconsiderable.   The accounts in Mississippi show various payment to Oakland College, and in addition to these there is a sum of $1911 charged to the heirs of *McGill*, besides the sum of $5058, which the brief of counsel assumes to be the only charge made to this account.   *McCall* swears that the children were supported from the Mississippi property, and there is nothing in the accounts or in the record to create a suspicion of his veracity.   The nature of the numerous items charged to the estate in the Mississippi accounts is not shown; but the fact that the property remained undivided and under administration of the mother, gives rise to the presumption that her family expenses were charged as debts of the estate.   This presumption, together with the items above enumerated, fully corroborate the testimony on this point.   The minors being supported from their property at home, there would be no propriety in charging their support again to the property in Louisiana.

3.  The next objection to be noticed, is to an item of $7700 charged as received from *Bondurant*, former tutor of the minors, and this objection is based on the account filed by him in court, which presents only the sum of $3711 64, as due by him.   Yet the accounts of *Fisk, Burke & Co.* show that the larger sum was actually transferred from his account to that of *Mrs. McGill*, so that the item is doubly supported by this account and by the oath of *McCall*.   The discrepancy is easily accounted for;  the account was probably rendered in court before full returns were received from the commission merchant, and when these returns were received the settlement was based on them and not on the judicial account.

4.  The crops raised on the Ducker or Botany Bay place are also carried into the account, and to this the opponent also objects.   The land alone belonged to *Mrs. McGill*.   She had no slaves and no stock.   The plantation was supplied with labor and implements, almost exclusively from the estates of the succession, and no separate account was kept of expenses.   The crops were carried into the same account with those of the succession, and the gross expenses are charged against the proceeds.   This is equivalent to charging them *pro rata* on the separate crops.   The allowance of rents for the land is sufficient remuneration;  nor do we believe that the result would be materially altered, by distributing the net proceeds, *pro rata*, to the value of the two properties employed in producing the crops.   The position that she must be credited in proportion to the price paid by her for the land is entirely untenable.   The price itself was extravagant and ruinous, and it was given for all the land, wooded as well as cleared.   The only land that contributed to produce the crops, was the cleared fields, consequently she could only, in any event, be entitled to a share in proportion to their real and not their exaggerated value of the acres actually cultivated.   As lands remain, while slaves and stock are perishable, the latter are of course entitled to a much larger share of the proceeds, in proportion to the value of the capital, than the former.   It is therefore idle to pretend that she is entitled to two-thirds the crops, because she gave $56,000 for the lands.   The mode adopted by the judge below, of allowing a rent for the lands, was the most simple as well as the most equitable mode of settling this division.

5.  The counsel attempts to exclude the crops of 1835, 1836 and 1837, from the account, on the ground that *McCall* says they were principally employed in improving the plantation, it being much out of repair.   But this testimony is entirely too loose and vague to deserve attention.   The bills of expenses were kept for those years by *McCall* himself, and were filed in court and stated in the account.   If any other expenses were incurred the bills would also have been produced.   The testimony therefore that the proceeds went principally to improvements amounts to nothing.   *Mrs. McGill* was bound to render her account to the heirs.   The proceeds of crops which came into her hands must be charged to her until evidence is produced of their specific appropriation to

other objects. They cannot be accounted for by the mere statement of a wit-
ness that they were principally employed in improvements.

6. It is assumed that no credit should be given to the heirs after the dates
when they respectively became of age. The property remaining under the
administration of the mother after her children became of age, she owed them
an account as agent. The balance against her carried no mortgage, but it was
not the less a debt, and to be allowed in settlement. This was the principle on
which the judgment was rendered, and it is obviously correct.

7. It is claimed that a partnership be decreed between the mother and her
children. There is no basis whatever for this pretension. The youngest of the
children only became of age in 1848, the last year for which *Mrs. McGill*
received the crops of this estate. This sufficiently accounts for the fact that
the property remained undivided, and relieves the case of any shadow of sus-
picion that any new convention between the heirs and their mother had altered
the legal relation resulting from the existence of her tutorship and agency.

8. The plea of prescription. We admit, that under the French authorities,
the action of the ward against the tutor for an account is barred by the pre-
scription "for the acts of the tutor,"—"pour les faits, etc." C. C. 356. 2 Toullier,
No. 1275. 3 Duranton, No. 642. 2 Troplong, Pres., No. 488. Vazeille, Pres.,
No. 574. 1 Zachariae, 250. 2 Marcadé, p. 262, No. 475. Sirey, Code Annoté,
art. 475, note 12. But we submit that the objection comes too late. The
opposition is in the nature of a revocatory suit, which is barred by one year.
The rendition of the account effectually bars the plea as to the accountant. If
the debt was prescribed, the act of reviving it by filing the account is one of those
acts of which creditors may complain. But they must do so within the year,
else their demand is barred. In this case the account was filed and an opposition
made to it on various grounds, but not including prescription. This opposition
was pending more than one year before this plea was filed. If the whole oppo-
sition had been delayed for the same time, it would have been too late. But
the interposition of the plea was equivalent to a new opposition. It presented a
new and distinct objection to the accounts. It complains that a debt barred by
prescription has been renewed. It ought, therefore, to be treated as a new
suit, and as such is itself prescribed. This plea is made only to the claims of
the two oldest of the heirs, and does not affect the others.

An attempt is made in the brief to cast suspicion upon the account, by the
pretence of concealment of titles to property acquired since the death of *McGill*.
This is both unjust and unfounded. *Mrs. McGill* answered the interrogatories
addressed to her, and so did *McCall*. They stated what lands and slaves had
been purchased, and did not produce the titles, only because they were not in
their possession. But the names of the slaves are all stated in the Mississippi
accounts, and the titles to the lands bought in this State are on the records.
*James McGill* was present during the trial below, but the opponent did not
think proper to call upon him for an answer to the interrogateries which had
been served upon him. It was not his place to tender the answer. The oppo-
nent does not pretend that he made any research for the titles, nor does he show
what fact he expected to prove by them. He prefers to raise the cry of con-
cealment. It can have as little effect on this point as the pretence that the
accountant concealed the death of her children because the fact was not men-
tioned in the accounts. Such broad cast assertions of fraud, on grounds so
palpably unjust, show nothing but a desire to prejudice the mind of the court as
to the true merits of the case. They do less harm to the person against whom
they are directed than to their author, upon whom they will always recoil.

It is proved that *Mrs. McGill* has paid to the opponent in this suit, on account
of the purchase of the Botany Bay lands, some seventy thousand dollars; that
the lands have since been sold under execution, the whole proceeds applied to
the debt, and a balance of forty thousand dollars or upwards still remains due.
This balance and her payments represent no value in her hands, for the property
has ceased to be hers, and the large payments thus made by her fully account
for the disposal of the proceeds of the crops of the succession. Two items, of
about $16,000 in all, are charged in the Mississippi accounts, and the balance
was paid from proceeds of the Louisiana property. The insolvency of *Mrs.
McGill* is not owing to the claims of her children, as assumed by counsel for
appellant, but to the ruinous contract made by her with the opponent himself,
and the heavy amounts sunk forever in the purchase. The debt is no doubt
due, but it is certainly not of a character to enlist any peculiar sympathy, or to

justify attacks without very strong grounds upon the motives of heirs, who ask nothing but the payment of their money which came to the hands of their tutrix and agent.

In conclusion, we submit that every just allowance was made by the lower court to the accountant, and that the judgment as rendered ought to be affirmed.

The judgment of the court was pronounced by

EUSTIS, C. J.   *Penelope McGill*, the surviving widow of *James McGill*, deceased, applied by petition to the Court of the Ninth District, sitting in the parish of Concordia, for the homologation of her final account as tutrix of her children, *James, Susan, John* and *Olivia McGill*, (the wife of *Augustus C. Watson*) who were heirs of the said *James McGill;* she prayed to be released from all further charge of the estate of said heirs, and for general relief.

The homologation of this account was opposed by the curator of the succession of *Ducker*.   The balance admitted to be due by the tutrix was very large, and was reduced on the opposition to some $84,000.   The judgment of the district court gave the heirs severally their share, with a tacit mortgage on the property of their tutrix.   From this judgment the curator of *Ducker's* succession has appealed ; and the heirs of *James McGill* are before us as appellees, being the parties in adverse interest to the appellant.

The changes which were made in the account, by which the balance was reduced to the amount allowed by the judgment, it is not necessary to notice, as they are acquiesced in by the appellees.   We will proceed to examine the several grounds presented by the counsel for the appellant for a reversal of the judgment.

I. The district court determined that no community existed between *James McGill* and his wife.   The first point made by the counsel for the appellant is, that all the property owned by the deceased at his death was acquired during his marriage, and was the property of the community ; and that, by his death, she became of right entitled to one-half of its revenues.

The parties were married in Mississippi previous to 1825 ; neither of them ever resided in the State of Louisiana.   The law of Mississippi, the place of their domicil, establishes no community of property between husband and wife. We do not consider the arguments relating to the existence of the community under the former laws of this State as applicable to the present case.   It is obvious that those laws would be utterly inoperative upon the parties unless they resided in the State or had property within it; and when, in 1828, by the repealing act, all the civil laws in force previous to the promulgation of the code were repealed, we are at a loss to conceive on what ground these former laws can be invoked by the appellees as regulating the matrimonial rights of parties domiciliated out of the State, and having no property within it.   It not being shown that the property left by *McGill* at his death was acquired by him previous to the date of the act of 1828, all inquiry as to the effect of any other law than that in force at the time the property was acquired seems to us quite superfluous.   The code provides that every marriage contracted in this State superinduces of right partnership or community of acquets and gains, if there be no stipulation to the contrary.   Art. 2369.   A marriage contracted out of this State between persons who afterwards come here to live is also subjected to the community of acquets with respect to such property as is acquired after their arrival.   Art. 2370.

That no community existed, by virtue of the laws of this State, in property acquired by either of the married persons within this State, whose marriage was not contracted within the State, nor who ever resided in it, we have always

understood as resulting from the evident sense of these articles.  In the much contested case of *Packwood*, 9 R. R. 438, the point appears to have been taken for granted, and we have acted upon it, in allowing the marital portion to the wife to which she succeeded as by inheritance.  *Dunbar* v. *Dunbar*, 5th Ann. 159.  *Cooper* v. *Cotton, ante* p. 256.

II. The next objection to the account which we shall notice is, that the mother has made no charge for the maintenance and education of the children.  It is urged by the counsel for the appellant that the expenses of the maintenance of the children should be charged against their estate in Louisiana, and not against their estate in Mississippi.  But their domicil was in Mississippi; it was there they were brought up and educated.  The revenues of the Mississippi property could certainly with great propriety be applied to their expenses, rather than those of the Louisiana property which was incumbered with debt.  We do not recognize the right of the creditor in a proceeding of this kind to defeat an appropriation of this character, which presents no feature of fraud, and which appears to be in conformity with the just and proper order of things.  It appears that these expenses were settled under the authority of a court of probates of the domicil of the parties, in an administration of the personal property of the succession in that State,—*Mrs. McGill* being the administratrix.  By that settlement, the portion of each heir in the slaves in Mississippi was assigned to each, and a balance established to be due by her to the distributees.

We do not find any sufficient evidence on which we can change the items charged for the expenses of the children's support and education, or make any additional charge against the heirs in the present account.  We concur with the district judge in the opinion, that they must be considered, so far as the appellant is concerned, as closed by the settlement of the estate in Mississippi.

III. *James McGill* became of age on the 31st of August, 1841, and *Susan* on the 23d of June, 1844.  Against the claims of these two heirs, the appellant has opposed the plea of prescription under the 356th article of the Civil Code, which provides that the action of the minor against his tutor, respecting the acts of the tutorship, is prescribed by four years, to begin from the day of his majority.  The article 475 of the Code Napoleon is to the same effect, and it is conceded by the counsel for the appellees, that under the French authorities the prescription would embrace cases of this kind.  Those authorities consider it immaterial whether any account has been rendered or not by the tutor, that an entire omission of this by the tutor does not prevent the prescription from accruing.  Troplong, Prescription, 489.  Although the debtor in this case may be considered as having renounced this plea of prescription, nevertheless, the appellant, being a judgment creditor, can avail himself of it.  Code, 3429.  Pothier on Obligations, 700.  Troplong, Prescription, 100, *et seq.*  The claims of these two heirs against their mother and natural tutrix we consider as prescribed.

IV. The claims of the two oldest being thus disposed of, it is only necessary for us to say, in relation to the ground urged by the counsel for the appellant, concerning the decreeing of a partnership between the two other heirs and their mother, that the evidence establishes no such relation between them.

The counsel for the appellant states in the close of his printed brief, that the true view of the case, although hinted at casually, has not yet been given; it is not and never has been one either of tutorship or of administration, and the rules of law applicable to the settlement of such cases have no bearing on this.  Throughout the argument are charges of fraud and collusion, and the court is appealed to, to adjudge the administration of the succession in Mississippi and

the tutorship in this State as mere means of spoliation. If such be the character of the case, it is to be regretted that the present form of remedy should have been adopted by the appellant, and that the whole subject is not brought before us in a proper suit, and under proper allegations, to enable us to adjudicate upon the whole. As the matter stands on the appeal, we necessarily confine ourselves to the matters adjudicated upon in the court below. The judge who decided the cause had not the benefit of an argument from the counsel for the appellant; his reasons are not given at length; and it is not surprising that any decision on such multifarious matters presented as these are, should be, at best, but an approximation to the real merits of the cause. Although we are not satisfied with the manner in which several of the charges are stated, either as to form or the principle on which they appear to be based, yet we have not sufficient evidence that another mode of stating them or a different principle would lead to a result materially different.

We think it was incumbent on the appellant to have placed the cause before us in such a manner as would have enabled us to close this litigation; which if continued as the case has been conducted in the court below, affords little prospect of any termination. And for this reason we are averse to remanding the cause.

It is therefore decreed, that the judgment of the district court, so far as the same relates to the claims of *James McGill* and *Susan McGill* against their mother and natural tutrix, resulting from her tutorship and the tacit mortgage resulting therefrom, on the property of their said mother, be reversed; and the opposition of the said curator of *Ducker* to said claims be sustained, and the said claims be disallowed; and that in other respects the said judgment of the district court be affirmed; the costs in both courts to be divided between the parties,— appellant and appellees each paying one-half.